# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| LISA NOGUERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-00302-N |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Noguera ("Noguera") filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that she was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-33. Pursuant to the consent of the parties (doc. 26), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. *See* Doc. 28.

The matter came on for oral arguments on Tuesday, April 15, 2014, at which time William T. Coplin, Jr. appeared for the plaintiff and Assistant United States Attorney Patricia Beyer represented the Commissioner. Upon consideration of the administrative record (doc. 14), as supplemented (doc. 21), the parties' respective briefs (Docs. 17, 22), and the parties' respective oral arguments at the hearing, the undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I.    Procedural History.

On July 21, 2010, Noguera filed her application for DIB benefits, alleging disability starting in May 12, 2009 (Tr. 163). The application was denied on October 4, 2010 (Tr. 108-112).   Following a hearing on May 17, 2010 (Tr. 66-83), Administrative Law Judge ("ALJ") Heather Joys entered an unfavorable decision on June 7, 2010 (Tr. 87-96).   Noguera requested a hearing before an ALJ that was acknowledged on October 19, 2010 (Tr. 113).   Following a second hearing on November 18, 2011 before ALJ Katie Hope Pierce (Tr. 29-59), ALJ Pierce entered an unfavorable decision on January 17, 2012 (Tr. 14-28).

The Appeals Council denied review of ALJ Pierce's decision on April 11, 2013 (Tr. 1-7), making this ALJ's decision the final administrative decision for purposes of judicial review.   *See* 20 C.F.R. § 422.210(a).[1]   This appeal followed.

II.    Issues on Appeal.

1.    Whether the ALJ properly evaluated and discounted the opinions of Noguera's treating physician, Stanley Barnes, M.D.?

2.    Whether the ALJ erred in finding that Noguera could perform her past relevant work as a sewing machine operator despite limiting her to only occasional use of arm and leg controls?

3.    Whether the Appeals Council properly considered the supplemental medical records submitted by Noguera on September 26, 2012, from her treating

---

[1]  All references to the Code of Federal Regulations (C.F.R.) are to the 2013 edition.

rheumatologist, James T. Jakes, M.D.?

III.     Standard of Review.

A.     Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam); Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2001); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *See* Richardson v. Perales, 402 U.S. 389, 401 (1971); Crawford, 363 F.3d at 1158; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence "is more than a scintilla, but less than a preponderance," Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). *See also*, Martin, 894 F.2d at 1529 ("Even if the evidence preponderates against the Secretary's factual findings, we must

affirm if the decision reached is supported by substantial evidence."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

The ALJ is responsible for determining a claimant's RFC, an ingrained principle of Social Security law. *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level under § 416.1429 or at the Appeals Council review level under § 416.1467, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity.") "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." Peeler v. Astrue, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. § 416.945(a). *See also*, Hanna v. Astrue, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010) ("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his ... impairments.'")(*quoting* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir.2004). "In making an RFC determination, the ALJ must consider all the record

evidence, including evidence of non-severe impairments." <u>Hanna</u>, 395 Fed.Appx. at 635 (citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."). The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. § 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [ ] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

(c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d).  *See also* <u>Kennedy v. Astrue</u>, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

B.  <u>Statutory and Regulatory Framework</u>.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they

are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).   The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[2]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.   *Id.*   It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the

---

[2] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). Id. at 1239–40.

IV.    Findings of Fact and Conclusions of Law.

A. Statement of Facts.

1.    Vocational Background.

Noguera was born on September 15, 1966, and was 43 years old on her alleged onset of disability date (May 12, 2009) and 46 years old on the date of ALJ Pierce's decision (Tr. 35, 163). Noguera has a high school education as well as two years of college (Tr. 35, 70-71), and worked approximately 20 years as a sewing machine operator (Tr. 72).

2.    Medical Evidence before the ALJ.

Of particular relevance in this case are the medical records of Stanley Barnes, M.D., Noguera's treating physician. On August 2, 2010, Dr. Barnes completed a "Medical Source Statement" in which he opined that Noguera could, *inter alia*:

- Lift and/or carry 5 pounds occasionally to 1 pound frequently.

- Sit 2 hours and stand 2 hours in an 8-hour day.

- Rarely push and pull using arm and/or leg controls.

- Never climb stairs or ladders.

- Rarely perform gross manipulations (grasping, twisting, and handling).

- Never perform fine manipulations (finger dexterity).

- Rarely bend or stoop.

- Occasionally reach, including overhead.

- Occasionally operate a motor vehicle.

- Rarely work with or around hazardous machinery.

(Tr. 244-45). In addition to these limitations, Dr. Barnes stated that Noguera required two hours rest in addition to a morning break, a lunch break, and an afternoon break; should avoid dust, fumes, extreme of temperature, humidity and other environmental pollutants; and would likely be absent from work as a result of her impairment more than four days per month. (Tr. 244). Dr. Barnes declared that the basis for these restrictions and Noguera's pain was her diagnosis of "systemic lupus erythmatosis, osteoarthritis, hypertension." (Tr. 244, 245). Dr. Barnes also completed a "Clinical Assessment of Symptoms" form in which he opined that Noguera's "fatigue and/or weakness . . . are present to such an extent as to be distracting to adequate performance of daily activities or Work," and that "physical activity, such as walking, standing, sitting, bending, stooping, moving of extremities . . . [g]reatly increased [her degree of fatigue] and to such a degree as to cause distraction from task or total abandonment of task." (Tr. 246). Dr. Barnes further stated that some side effects of prescribed medicated can be experienced "but these will be only mildly troublesome to the patient." (*Id*.). In a separate "Disability Questionnaire" form, Dr. Barnes declared that Noguera could not work a full time job and her condition, namely "Lupus (SLE)" and "osteoarthritis," is permanent. (Tr. 247).

Dr. Barnes's office notes contained in the Social Security Transcript filed on November 19, 2013 (doc. 14) refer to Noguera's office visits on 4/1/10 (Tr. 241), 5/5/10 (Tr. 239), 7/21/10 (*Id*.), 8/24/10 (Tr. 240), 10/12/10 (Tr. 238), 10/28/10 (Tr. 236, 237), 11/17/10 (Tr. 236), 12/21/10 (Tr. 233), 2/23/11 (*Id*.), 4/25/11 (Tr. 234), 5/24/11 (Tr. 235), 6/23/11 (*Id*.), 7/28/11 (Tr. 259), 8/29/11 (*Id*.), 9/29/11 (Tr. 258, 285), 10/31/11 (Tr. 285), 12/13/11 (Tr. 284), and 1/16/12 (*Id*.). In most of these office notes, Dr. Barnes reports, in pertinent part and with only slight variation, that Noguera "comes in with the complaint of pain in back, hip and knees" or "complaint of pain in her joints," that her "[e]xtremities show evidence of some arthritis," and whether a new medication was prescribed or continued because it proved helpful. (*See e.g.*, Tr. 233-241, 258-259, 284-285). Noguera was usually instructed to "[c]heck back with us in the next month or two" for follow-up. (*See e.g.*, Tr. 233). Dr. Barnes does not, in any note, explain what he means by "evidence of some arthritis" or describe any specific physical limitation experienced by Noguera. The diagnosis of Lupus was first set out by Dr. Barnes in his note on 7/21/10 as simply a "Positive lupus test." (Tr. 239). Similar references to "Lupus, positive test" or "tests positive for lupus" were made in Dr. Barnes's office notes on 12/21/10 (Tr. 233) and 11/1/11 (Tr. 285). The only other note referring to "Lupus" relates to an office visit on 1/16/12, in which Dr. Barnes states his intent to "refer [Noguera] to a rheumatologist that accepts Medicaid we hope" (Tr. 284).

On August 24, 2010, Dr. Barnes reported that he put Noguera on some Prednisone and "it has helped her out" (Tr. 240). He stated further stated that, "[i]n fact it's been

the best medicine that she's taken so far" (*id*.). He also reported that Noguera "doesn't have any joint deformity or anything going along with any musculoskeletal related osteoarthritis or even systemic related osteoarthritis such as lupus but her ANA is positive and Prednisone is working and we'll just leave it at that" (*id*.)

On August 30, 2010, Stephen M. West, M.D. conducted a consultative examination of Noguera, who reported to him that she was applying for disability due to polyarthralgia (pain in several joints simultaneously)[3] and polymyalgia (pain in several muscle groups),[4] and that her joints hurt her all the time. (Tr. 230). Noguera also told Dr. West that she was having problems sleeping at night and problems with range of motion, inability to do manual labor, high blood pressure, dizziness and headaches (Tr. 230). She also reported having "real bad gout and her feet hurt . . . from gouty arthritis" (Tr. 230). Although Dr. West found that Noguera's blood pressure was 164/100 resulting in an assessment of "hypertension out of control," his physical examination of Noguera was otherwise reported as follows:

> Vision: Right 20/13, left 20/13 and both 20/13. Hearing: Within normal limits. Neurologically: Cranial nerves 2-12 are grossly intact. No obvious motor or sensory deficit. Musculoskeletal: Grip strength bilaterally 5/5. Flexion and extension of both wrists 5/5. Flexion and extension of both elbows 5/5. Flexion, extension, abduction and adduction of both shoulders 5/5. Plantar flexion and dorsiflexion bilaterally 5/5. Flexion and extension of both knees 5/5. Flexion, extension, abduction and adduction of both hips 5/5. The patient would only bend over to knee level because she says she gets dizzy when she bends over. She would not do a squat for

---

[3] *See,* http://medical-dictionary.thefreedictionary.com/polyarthralgia.

[4] *See,* http://dictionary.reference.com/browse/polymyalgia.

> the same reason. She complained of dizziness. She could do heel-toe maneuvers. She walked with a normal gait. Examination of all her joints revealed full range of motion. I saw absolutely no contractures or destruction of the joints. She had full flexion and extension of her cervical spine with lateral rotation left and right to 70 degrees.

(Tr. 231). In addition to the hypertension, Dr. West's assessment included "Polymyalgia and arthralgia with positive ANA" and "Gout," but he concluded that "[t]his is a 43 year old female who presents to my office today with a completely normal exam" (Tr. 231).

Dr. Barnes completed a second "Medical Source Statement (Physical)" on March 1, 2012, in which he opined that Noguera's limitations had increased as follows:

- She could now sit only 1 hour and stand or walk only 1 hour in an 8-hour day.

- She could now only rarely reach, including overhead.

- She could now only rarely operate a motor vehicle.

(Tr. 287). In contrast to his earlier assessment, however, Dr. Barnes also opined that Noguera could rarely, as opposed to never, perform fine manipulations (finger dexterity). This current assessment also did not contain an opinion that Noguera required additional rest during the workday and declared that Noguera would likely be absent from work as a result of her impairment more than three days per month. (Tr. 287). Dr. Barnes set forth no clinical diagnosis on this assessment but, instead, declared that the basis for the March 1, 2012 restrictions was Noguera's "XRay Findings, Exam Findings" (Tr. 287). Dr. Barnes also completed a "Clinical Assessment of Pain" form in which he opined that Noguera's "pain is present to such an extent as to be distracting to adequate performance

of daily activities," and that "physical activity, such as walking, standing, bending, waving of extremities, . . . [g]reatly increased pain and to such a degree as to cause distraction from task or total abandonment of task." (Tr. 288). Dr. Barnes further stated that significant side effects of prescribed medication "may be expected which may limit effectiveness of work duties or performance of everyday tasks, e.g. driving" (Tr. 288).

Noguera received mental Health treatment from Southwest Alabama Mental Health, but did not have any identified functional limitations from her mental impairments (Tr. 260-283).[5]

3. Records submitted to the Appeals Council.

Noguera submitted additional records to the Appeals Council related to her visits to Dr. Barnes in 2012 and 2013, as well as to the rheumatologist in 2012, and these records were filed in this case on February 7, 2014, as a Supplemental Social Security Transcript (doc. 21). These records include Noguera's visit to Dr. Barnes on February 15, 2012, and his report stating, in pertinent part:

> Patient comes in with the complaint of pain in back, hip and knees. She has joint pain. She has appointment to see the rheumatologist coming up. . . . Extremities show evidence of arthritis.
>
> A: 1. Benign hypertension
> 2. Osteoarthritis
> 3. Musculoskeletal pain

---

[5] Noguera does not challenge the ALJ's finding that her mental impairments were nonsevere. (Doc. 17 at 3-10).

(Tr. 326).    No further elaboration regarding the "evidence of arthritis" is provided.

Noguera's presenting problem for her visit to Dr. Barnes on March 22, 2012 was reported as "body pain after falling" (Tr. 326).    She told Dr. Barnes that "she was going down the steps . . . and sort of slipped and fell" (*id*.).    Dr. Barnes noted that her extremities "[s]how arthritis" and reported his assessment as "Musculoskeletal pain [and Low back pain" (*id*.).    No physical examination results or observations are reported.

The rheumatologist, James T. Jakes, M.D., examined Noguera on April 24, 2012 (Tr. 334-335).    He reported that she had full range had full range of motion of all of her joints without pain, stiffness, swelling, or instability (Tr. 334).    He also reported that she had trigger points in her back, but that her reflexes, pulses, sensation, and strength were all normal (*id*.).    Dr. Jakes opined at this visit that her "primary problem is fibromyalgia" and he recommended "increasing her trazodone and continue her other medication at her present dose" (Tr. 335).    A "complete laboratory evaluation for inflammatory connective tissue disease" was performed (Tr. 334, 338-345).

On April 30, 2012, Noguera presented to Dr. Barnes "with aches and pains in her left knee" as well as for a pap smear and blood work (Tr. 325).    No mention is made of her visit to Dr. Jakes.    Her blood pressure was 150/86 (*id*.). Dr. Barnes reported that "[h]er extremities show evidence of arthritis in the left knee" but does not further describe that evidence (*id*.).    He reported his assessment of that office visit as "Left knee pain [and Benign hypertension" (*id*.).    No physical examination results or observations

are reported.

Noguera returned to Dr. Jakes on June 5, 2012, and the office notes indicate that her "ANA, rheumatoid factor, sed rate etc. were ***totally normal*** except for mildly elevated anticardiolipin antibody" (Tr. 333, emphasis added). Dr. Jakes reported:

> Fibromyalgia. This problem is doing about as well as she can with medication. I told her at this point I cannot establish a diagnosis of any sort of inflammatory arthritis. The best she can do for her joint symptoms would be to continue the Mobic and Tylenol. I will see her back as needed. With regard to the anticardiolipin antibodies she has had no blood clots. I don't believe she needs any treatment for that problem at this time. We will just be aware of it. I told her to return if she develops persistent joint swelling.

(Tr. 333). Dr. Jakes reported the subjective findings as follows

> The patient returns today stating that she is sleeping fairly well on her present dose of trazodone and tizanidine. She still aches in most of her joints. She is mildly diffusely stiff in the morning. She is taking Mobic and Tylenol,

(Tr. 332). Dr. Jakes also reported his physical exam results as follows, in pertinent part:

> The patient has no synovitis in any joint. She has full range of motion of all joints. She has no trigger points [in] her back. Vital signs recorded. . . . Abdomen – no organomegaly, masses, tenderness, bruits, CVA or spine tenderness.

(Tr. 332). There is no further evidence of record that Dr. Jakes has seen Noguera since that June 5, 2012 visit.

On June 7, 2012, Noguera presented to Dr. Barnes and he reported that she had seen Dr. Jakes who "diagnosed her with fibromyalgia", adjusted her medications, and "kept her on anti-inflammatories" (Tr. 295, 324). He further reported that she "is doing

fairly well over all" (*id.*).   He also reported that the rheumatologist "put her on some Trazodone, told her to take it at nighttime to help her to rest [and] [i]t should help her with musculoskeletal pain" (*id.*).   Dr. Barnes also reported that Noguera takes a Lortab once a night that "helps her to rest and helps with her pain [and] [o]ther than that her rheumatoid profile is negative" (*id.*).   He also stated that Noguera's extremities "[s]how some nonspecific generalized aches and pains" (*id.*).   He gave her Lortab to take once a day and a refill for the following month but told her that, in the future, "we might want to just stop this medicine altogether" (*id.*).

On August 7, 2012, Noguera returned to Dr. Barnes "with overactive bladder problems" (Tr. 294).   Her blood pressure on this occasion was 120/82 (Tr. 295).   Dr. Barnes prescribed some new medication and also reported that Noguera's "[e]xtremities, neurologic and skin examinations are otherwise normal" (Tr. 294).[6]

Noguera returned to Dr. Barnes on September 18, 2012 "with back pain, acutely hurting" for which he gave her medication (Tr. 294).   No physical examination results or observations concerning her back are reported.

On October 17, 2012, Noguera presented to Dr. Barnes with "pain in both breasts" and an elevated blood pressure of 152/86 (Tr. 293).   She informed Dr. Barnes that she had not taken her blood pressure medicine and was encouraged to do so (*id.*).   Dr. Barnes scheduled her for a mammogram, opined that she had "some sort of mastitis, and

---

[6] Dr. Barnes's use of the term "otherwise" in this statement is not clear because the only abnormal result he reported was with reference to Noguera's "stress incontinence issues" (Tr. 294).

prescribed antibiotics (*id.*).

The primary issue at Noguera's visit to Dr. Barnes on December 4, 2012 was her elevated blood pressure (220/118 brought to 186/110 with treatment). (Tr. 292). A notation was also made that her extremities "[s]how arthritis" (*id.*). No further elaboration or explanation was given.

On January 8, 2013, Noguera is reported as presenting "with headache, dizziness, and allergy/sinus problems [and] BP is 152/100" (Tr. 291). Dr. Barnes reported that her chest was clear but his examination "shows some perennial allergic rhinitis/sinusitis" (*id.*). He further reports that her [e]xtremities show evidence of generalized arthralgia" but does not further elaborate or include any reference to her extremities in his assessment (*id.*).

On February 11, 2013, Noguera presented "with neck pain that happened the other night [and] woke her up from her sleep" (Tr. 291). Although she reported having a blood pressure of 200/100 at that time, her blood pressure was 160/96 at the office visit (*id.*). Dr. Barnes assessed her as having "Cervical spine pain" and "Hypertension" but did not indicate any immediate treatment (*id.*). He reported that "I think we are going to have to add something else" to the "couple of medications" she was already taking, presumably for her blood pressure (*id.*, *see also* Tr. 42, Noguera's testimony regarding her blood pressure medicine). Dr. Barnes further reported that her [e]xtremities show evidence of some arthritis" but again does not further elaborate or include any reference

to her extremities in his assessment (*id.*).

The last reported visit in the record is dated March 11, 2013, a visit in which Noguera presented to Dr. Barnes "with chest pain . . . in the middle of her chest" (Tr. 290). She is also reported as "complaining of dizziness off and on" (*id.*). Her blood pressure was 150/86 (*id.*). Her upper respiratory (Head, Eyes, Ears, Nose and Throat, otherwise known as "HEENT") was "negative and her chest was "Clear" (*id.*). Dr. Barnes assessment was set forth as "Chest pain" and "Arthritis with musculoskeletal pain" and, other than reporting that her extremities "[s]how arthritis," no further explanation or observations were presented.

### 4. Plaintiff's Testimony.

On August 5, 2010, Noguera signed a functional report she completed describing her daily activities, abilities, and work history (Tr. 187-202). She reported that she cared for herself, although she felt weak and tired when doing so (Tr. 188). She cooked daily and cleaned "a little" (Tr. 189). She drove, rode in a car, and could go out alone (Tr. 190). She also reported that, if she shops, she does so in stores with her husband for "maybe 30 or 40 min[utes]" as well as by phone, mail and computer (Tr. 190). She was able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 190). Her hobbies and interests included "reading, sewing and watching TV" (Tr. 191). She also talked on the phone, used a computer, and went to church and her husband sometimes took her riding (Tr. 191). She estimated that she could walk a quarter-mile

before having to stop and rest, and could pay attention for three to four hours at a time (Tr. 192). She also described her past jobs, most of which involved sewing (Tr. 195-200). These jobs involved mostly sitting, with minimal walking and standing, and sometimes required her to lift as much as 20 pounds occasionally and 10 pounds frequently (*id.*).

Noguera was represented by counsel at the hearing on November 18, 2011 (Tr. 29-59). She testified that she could not work because her hands hurt and were weak (Tr. 36). She said that her husband handled cooking and household cleaning (Tr. 36-37). She further testified, however, that she could tie shoes and pick up individual coins from a table (Tr. 37). Noguera stated that she was "not really" able to drive anymore, had driven the last time "in over a year" because of "my fatigue, and I get nervous" (Tr. 37). She testified that she was undergoing mental health treatment for stress and depression, including sessions every two weeks, and confirmed that she had noticed an improvement (Tr. 37-38). She also confirmed that she had in her hands a piece of cloth about the size of a tissue, which she carried "all the time [and] even sleep[s] with it" and which, during her testimony, she was "just a working it" because "it calms my nerves" (Tr. 38-39). She further testified that, although she can pick things up, she couldn't hold a gallon of milk in one hand or an iron skillet. She has her husband buy milk in half gallons (Tr. 39-40). She claims that, since the first of 2010, "I started to get worse and worse" and her husband had to take over doing "whatever housekeeping gets done" and "helping [her child] with the things he needs" (Tr. 40).

Noguera testified that "maybe two or three" days every month she is unable to get out of bed because of her "joints and sometimes my hypertension" (Tr. 41). During the six months between her hearing on May 17, 2010, and the hearing on November 18, 2011, Noguera testified that her joint pain, lupus, and eyesight have "gotten worse" and she was told she had gout (Tr. 42). She also contended that her hands and feet would swell every day if she did not elevate them for 30 to 40 minutes one to two times a day (Tr. 42). She said she could stand for 15 minutes at a time, could not walk the length of a football field, and could only sit for an hour at a time before having to get up and move about or lie down for 30 minutes (Tr. 43-44). Noguera testified that she saw Dr. Barnes every month for her high blood pressure, fatigue, joint pain, lupus and gout and he gave her two injections but she has not been told what the injections were for (Tr. 45). She stated that on a good day she could load the dishwasher and do a little sweeping (Tr. 46). She also testified that the medicine her doctors prescribed gave her "moderate relief" (Tr. 47). She also claimed to suffer from migraine-like headaches "once or twice a week " that last "three days" and require her to take over-the-counter medicine and "lay down and go to sleep" (Tr. 48-49). She stated that her husband had to help her wash her hair because her arms got tired and she could not hold them up long enough (Tr. 49). She also claimed that she no longer managed money for her household and had trouble concentrating, so she turned that over to her husband (Tr. 50). She also complained that her right knee was hurting during the hearing (Tr. 51).

       5.    <u>Vocational Expert Testimony</u>.

A vocational expert testified at the hearing that Noguera's past work as a sewing machine operator and doing alterations would be classified as a light skilled job with an SVP of 5.[7] (Tr. 52).   The ALJ questioned the vocational expert about a hypothetical individual of Noguera's age, education, and vocational background, who could perform a reduced range of light work; could stand or walk for up to six hours in an eight hour day; sit for up to six hours in an eight hour day; could occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs; could occasionally push or pull leg and arm controls; and could never climb ropes, ladders, or scaffolds.   (Tr. 53).   The vocational expert testified that such an individual could perform Noguera's past relevant work as a sewing machine operator. (Tr. 53).   The vocational expert testified that her testimony was consistent with the Dictionary of Occupational Titles (Tr. 55).

The ALJ presented a second hypothetical about a hypothetical individual of Noguera's age, education, and vocational background, who could perform only sedentary work and could sit only one hour at a time and then must change positions for 30 minutes while continuing to work before returning to a seated position.   (Tr. 53). In addition, this person could occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs; could occasionally push or pull leg and arm controls; and could never climb ropes, ladders, or scaffolds and could not work around dangerous machinery or operate

---

[7] The Dictionary of Occupational Titles (DOT), in classifying each occupation, has a category captioned Specific Vocational Preparation (SVP) which "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   Dictionary of Occupational Titles 1009 (4th ed. 1991).   The scale ranges from one to nine with level one requiring only a short demonstration while a level nine occupation requires over ten years of preparation.   *Id.*

automotive equipment. (Tr. 53). The vocational expert testified that there were no occupations such an individual could perform. (Tr. 54).

A third hypothetical was proposed which was the same as the first hypothetical, except that the individual could perform only sedentary work and could sit for up to one hour at a time and then would need to change positions for at least 10 minutes before returning to the seated position but could continue working for this change of position. (Tr. 54). The vocational expert testified that such an individual could not perform Noguera's past relevant work as a sewing machine operator but that there were other jobs available (Tr. 54). The jobs proposed included: surveillance system monitor (DOT # 379.367-010), which is sedentary and unskilled and there exists in the national economy approximately 87,800 such jobs and 900 in the State (Tr. 54, 55); call out operator (DOT # 237.367-014), which is sedentary and unskilled job with 57,000 in the national economy and 540 in the State (Tr. 54-55); and a sedentary assembler position (DOT # 559.687-034), with 102,000 in the national economy and 1,500 in the State (Tr. 55).

In response to counsel's questioning, the vocational expert also testified that "[e]mployers generally do not allow more than one to two days per month" missing work (Tr. 56). The vocational expert also confirmed that no jobs existed for an individual with the profile set forth by Dr. Barnes in his assessment on August 2, 2010 (Tr. 57-58, *citing* Tr. 244-246).

6.  ALJ's decision.

The ALJ followed the five-step sequential evaluation process for evaluating

disability claims. *See* 20 C.F.R. § 404.1520(a)(4). The ALJ specifically found that Noguera had severe impairments consisting of lupus, gout, hypertension, and osteoarthritis, but that her impairments did not meet or medically equal any of the impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1, including specifically Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 14.02 (systemic lupus erythematosus) (Tr. 19-21).

The ALJ discounted Noguera's claim of migraine-like headaches because, *inter alia*, "there is no evidence in the record that [she] has been diagnosed with, or treated for, migraines or any type of headache [and] the record documents no abnormal neurological findings" (Tr. 19). The ALJ also relied on Dr. West's finding that Noguera's cranial nerves were "intact with no obvious motor or sensory deficits" (Tr. 20, *citing* Tr. 231).

The ALJ addressed Noguera's remaining impairments as follows:

> No examining or treating physician has reported that the claimant has an impairment that meets or medically equals the criteria of a listed impairment. The claimant's lupus does not meet the requirements of listing 14.02A because there is no evidence of involvement of two or more organs/body system with one involved to at least a moderate degree and two of the constitutional systems or signs, i.e. severe fatigue, fever, malaise, or involuntary weight loss. The record documents only occasional complaints of fatigue and malaise with generally no fever or involuntary weight loss. The claimant's lupus does not meet the requirements of listing 14.02B because there is no evidence of marked limitations in activities of daily living, social functioning, or in concentration, persistence or pace. The claimant's osteoarthritis does not meet the requirements of listing 1.02 because there is no evidence of an inability to ambulate effectively or an inability to perform fine and gross movements effectively. The claimant's osteoarthritis also does not meet the requirements of listing 1.04 because there is no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Hypertension and gout are not listed impairments and the claimant's

hypertension and gout do not result in the marked functional limitations that would suggest medical equivalence to any listed impairment.

(Tr. 21).

The ALJ considered all the testimonial, medical, and medical opinion evidence in the record, and concluded that Noguera had the residual functional capacity to perform light work, with additional limitations as described to the vocational expert. As part of this assessment, the ALJ determined that her complaints were not entirely credible and weighed the opinion evidence in light of all the other evidence in the record. The ALJ then relied on the vocational expert's testimony to find that she could perform her past relevant work as a sewing machine operator, and was not disabled under the Social Security Act (Tr. 21-25).

B. Analysis.

1. **The ALJ did not err in discounting the opinion of Noguera's treating physician, Stanley Barnes, M.D.**

Noguera argues, in sum, that the ALJ erred in rejecting Dr. Barnes's opinion regarding her physical limitations because the ALJ "mischaracterized Dr. Barnes's office notes and used her error to reject the opinion of the treating physician, Dr. Barnes, and accept the opinion of Dr. West, a one-time examiner" (doc. 17 at 4). The ALJ did state that she "gives less weight to the opinion of Dr. Barnes (Exhibit B2F) as his opinion is inconsistent with his own treatment notes, which show nothing disabling, and Dr. West's examination findings" (*see*, doc. 17 at 4). Noguera makes no attempt to demonstrate how the ALJ is alleged to have mischaracterized Dr. Barnes's notes but, instead, merely

argues that the ALJ "must be more specific in identifying reasons to reject the opinion of the treating physician" (*id.).* Noguera's contentions are without merit.

The Commissioner argued, in sum, that the ALJ reasonably discounted the limitations imposed by Dr. Barnes because they were not only inconsistent with his office notes but they were "based entirely on [Noguera's] subjective complaints about her joint and back pain," which were themselves inconsistent with Dr. Barnes's office notes and the medical records. (Doc. 22 at 9). The Commissioner further contends that the ALJ properly found that Noguera's subjective complaints "were not entirely credible," a finding not contested in this appeal. (*Id.*, *citing* 20 C.F.R. §§ 404.1528(a), 404.1529(a)).

Generally, the opinion of a treating physician must be given substantial weight, or credit, unless "good cause" is shown to the contrary. *See* Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). However, an ALJ may properly discount the opinion of a treating physician if the opinion is conclusory, inconsistent with their own medical records, or if the evidence supports a contrary finding. *See* Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (*citing* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)); Lewis, 125 F.3d at 1440; *see also* 20 C.F.R. § 404.1527(c)(2)(if medical evidence is internally inconsistent, the Commissioner may weigh all the evidence and make a decision if he can do so on the available evidence); § 404.1527(d)(4) (generally, the more consistent an opinion with the record as a whole, the greater weight it will be given). If the ALJ discounts the opinion of a treating physician, the ALJ must clearly articulate the reasons. Marbury v. Sullivan,

957 F. 2d 837, 841 (11th Cir. 1992) (*per curiam*); Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987).   Also, the reasons must be legally correct and supported by substantial evidence in the record.    Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Hale, 831 F.2d at 1012.

In this case, the ALJ correctly found that Dr. Barnes's opinion regarding Noguera's residual functional capacity and pain was not only inconsistent with his office notes but that it was inconsistent with the objective physical examination results documented by Dr. West.   The medical evidence subsequently supplied regarding Noguera's examination and treatment by Dr. Jakes, her rheumatologist, also contradicts Dr. Barnes's opinion, thus essentially negating Noguera's argument that the ALJ erred by relying on the fact that she had not yet "sought treatment from a rheumatologist or any other specialist such as a pain management specialist."    (Doc. 17 at 4, *citing* Tr. 23).[8]

Noguera also takes issue with the ALJ's reference to the conservative treatment of medication and B12 shots given by Dr. Barnes on the grounds that "on April 25, 2011, she stated the shots lasted 'for just a few days or so'."    (Doc. 17 at 4, *citing* Tr. 234). The evidence of record establishes, however, that Noguera received the subject shots[9] on

---

[8] Noguera specifically argued, in sum, that the ALJ erred because she failed to acknowledge that "Ms. Noguera did not receive an actual referral [to a rheumatologist], not because she declined one, but because the doctor's office could not or did not locate a rheumatologist who accepted Medicaid to make the referral [and] Ms. Noguera cannot be denied disability for the lack of available treatment." (Doc. 17 at 4).   Noguera was not, however, denied disability for lack of available treatment but, instead, for failure to meet her burden to prove that she was disabled.   The examination and treatment notes of Dr. Jakes, the rheumatologist, supports the ALJ's conclusion, *albeit* after the fact.

[9] In addition to the B12 shot, Noguera would receive an injection of Toradol 15 mg, a "nonsteroidal anti-inflammatory drug [that] works by reducing hormones that cause inflammation and pain in the body." *See*, http://www.drugs.com/toradol.html.   She also received an injection of Celestone

some, but not all, of her office visits to Dr. Barnes, including visits on 12/21/10 and 2/23/11 (Tr. 233), 4/25/11 (Tr. 234), as well as those following her statement that the effects last "for just a few days or so" (Tr. 234), including 5/24/11 and 6/23/11 (Tr. 235), 7/28/11 and 8/29/11 (Tr. 259), 9/29/11 (Tr. 258), 11/1/11 (Tr. 285), 12/13/11 and 1/16/12 (Tr. 284), 2/15/12 and 3/22/12 (Tr. 326), and 4/30/12 (Tr. 325).   On no occasion except April 25, 2011, did Noguera complain that the shots were ineffective.

Noguera's contention that Dr. West's opinion was entitled to less weight because he was a one-time examiner and "his examination took place well over a year prior to the ALJ's decision" (doc. 17 at 4) is also of no consequence. The evidence of record does not support a contention that her condition changed in any relevant way after Dr. West's examination.   The ALJ correctly deferred to Dr. West's opinion, which was supported by objective evidence of Noguera's condition, and properly discounted Dr. Barnes's conclusory opinions that were not supported by his own treatment notes or the medical records in evidence.

> 2.  **The ALJ did not err in finding that Noguera could perform her past relevant work as a sewing machine operator despite limiting her to only occasional use of arm and leg controls.**

Noguera next argues, in sum, that the ALJ failed to properly determine that she could perform her past relevant work as a sewing machine operator in light of the finding that she could only "occasionally push and pull arm and leg controls." (Doc. 17 at 6,

---

3.5 mg, a steroid drug that "prevents the release of substances in the body that cause inflammation." *See*, http://www.drugs.com/search.php?searchterm=Celestone.   The dosage given Noguera never varied.

*citing* Tr. 21). Noguera predicates this argument on an assumption, namely that "it can be assumed that at that time, the use of sewing machines required the use of foot controls on a constant or frequent basis." (Doc. 17 at 6). She then argues that the ALJ failed to properly develop the record concerning the duties of her past relevant work (*Id.* at 7). Contrary to her contention, Noguera completed a Work History Report (Tr. 195-202) that described her job duties in sufficient detail to support the Vocational Expert's opinion and the ALJ's conclusion that she could perform her past relevant work.

In addition, the vocational expert testified that an individual of Noguera's age, education, and vocational experience, and with functional limitations that were the same as her residual functional capacity finding (Tr. 21) could perform Noguera's past relevant work as a sewing machine operator and that this testimony was consistent with the *Dictionary of Occupational Titles* (Tr. 52-55). This is all that was required and provides substantial evidence to support the ALJ's decision. *See* Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (recognizing that a vocational expert's testimony constitutes substantial evidence where the ALJ includes all credible impairments when posing a hypothetical question); 20 C.F.R. § 404.1560(b)(2) (vocational expert may testify in response to a hypothetical question about whether a person with claimant's limitations can meet the demands of the claimant's past relevant work); 68 Fed. Reg. 51153, 51160 (Aug. 26, 2003) (comments to final rule) ("[vocational expert] testimony may be obtained at step 4 to provide evidence to help us determine whether or not an individual can do his or her past relevant work").

Noguera does not identify any evidence that would call this finding into question, and it is her burden to do so. *See* 20 C.F.R. § 404.1512(a) (claimant bears the burden of proof). This Court cannot speculate that the *Dictionary of Occupational Titles* was not consistent with the vocational expert's testimony, ignore the vocational expert's sworn statements to the contrary, and overturn the ALJ's decision based on such speculation.

The evidence of record, as demonstrated above, provides substantial evidence that supports the ALJ's decision that Noguera was not disabled. The Court must affirm the ALJ's decision because it is supported by substantial evidence. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). Noguera's arguments to the contrary are without merit.

3. **The Appeals Council properly considered the supplemental medical records submitted by Noguera on September 26, 2012, from her treating rheumatologist, James T. Jakes, M.D.**

Contrary to Noguera's contention, the Appeals Council received additional records from Dr. Barnes and records from Dr. Jakes (Tr. 285-345) when she originally submitted them and considered them before declining her request for review.[10] Prompted by Noguera's Motion to Correct the Record, the Appeals Council issued the supplemental certified administrative record to correct its oversight in not including these documents in the first certified administrative record (Supp. Tr. 1).

Noguera also argues that Dr. Jakes's diagnosis of fibromyalgia[11] requires a

---

[10] *See*, Tr. 2 (the Appeals Council considered treatment records from February 15, 2012 through June 7, 2012, the time period for Dr. Jakes's records); and Supp. Tr. 1 (records from the supplemental certified administrative record were inadvertently not included in the first certified administrative record)).

[11] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied

remand "for proper consideration of the diagnosis." (Doc. 17 at 10). The Commissioner argued, in sum, that the supplemental medical records submitted to the Appeals Council were "not 'material' because it supports the ALJ's determination, and would not change the administrative outcome. (Doc. 22 at 10, *citing* <u>Hyde v. Bowen</u>, 823 F.2d 456, 459 (11th Cir. 1987)(" In order to prevail on a claim that remand is appropriate, a claimant must establish that: "(1) there is new, noncumulative evidence; (2) the evidence is 'material,' that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result, and (3) there is good cause for failure to submit the evidence at the administrative level.")).

Dr. Jakes's initial examination in April 2012 showed that Noguera had full range of motion of all of her joints without pain, stiffness, swelling, or instability. While she had trigger points in her back, her reflexes, pulses, sensation, and strength were all normal (Tr. 334-35). Dr. Jakes saw Noguera again in June 2012, when she reported that she was sleeping fairly well, but had mild stiffness in the morning, with her prescription painkillers. When Dr. Jakes examined her, she no longer had trigger points in her back and she had full range of motion in all joints. Dr. Jakes further noted laboratory data showing that her ANA, rheumatoid factor, and other markers were "totally normal" except for mildly elevated anticardiolipin antibody (Tr. 332-33, 337-45).

---

by fatigue, sleep, memory and mood issues [and] Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals." http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/CON-20019243. "While there is no cure for fibromyalgia, a variety of medications can help control symptoms [and] [e]xercise, relaxation and stress-reduction measures also may help. (*Id*.).

In addition to Dr. Jakes' notes, Noguera also submitted to the Appeals Council 2012 and 2013 records from Dr. Barnes, which indicated that he continued to treat her complaints of joint pain with pain medication (Tr. 290-295, 324-326) but opined in August 2012 that her extremities and neurological examination were normal (Tr. 294). Dr. Barnes did not otherwise perform any specific functional examination during the period covered by the supplemental records.

Consequently, although Noguera asserts that Dr. Jakes' opinion was supported by "the records of Dr. Barnes and Dr. West," she has failed to establish that his opinion is contrary to the ALJ's determination. She has, therefore, failed to establish that the supplemental medical evidence submitted to the Appeals Council would change the administrative outcome if the case were remanded.

CONCLUSION

For the reasons set forth above, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be and is hereby **AFFIRMED**.

Final judgment in accordance with this memorandum opinion and order shall issue by separate document.

**DONE** and **ORDERED** this ___8th___ day of July 2014.

/s/ Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE